Good morning. This is case number 4-13-0394 in re the Marriage of Sheridan. Attorney Martinkus is here on behalf of the appellant. Attorney Lerner is here on behalf of the affilee. Are you ready to proceed, Mr. Martinkus? Yes, I am ready. May I please have the floor? Good morning, your honors. It's supposed to be about the kids. That's what these decisions are supposed to be about. And in this case, if you look at this decision, it's truly not about the best interest of the kids. How do I know that? How do you know that? You can look to the opinion itself. Just as Judge Blockman gives us a lot of insight into the facts and his thinking, and I think it's important for you to look at what he says. This is a quote. He says, in any event, the court recognizes that the transition for the children would be quite difficult. I think that's telling in itself. That's in his decision. That's right in his opinion. Why the court deemed it appropriate to make a transition for the children that would be quite difficult is difficult for me to understand. The court continues, a good argument could be made to keep the children with the mother. He says, the children are doing very well in their school and preschool education. They're in the familiar surroundings of the former Merrill residence. The maternal grandparents continue to be available to assist. The mother has been the primary custodial parent. And the children have been with the mother since the parties separated on July 16th or 21st, 2011. So those are the first things that you have to look at when deciding whether or not the court used his discretion in this case. You have a situation where the kids are doing great. This is an incredibly involved parent, incredibly involved mother. Her mother has assisted with these kids for all the time that they've been around. Mr. Sheridan's family, I believe the testimony was, had actually had the kids over to their house four times in seven years. If you look at the transcript and look at the testimony, there's almost no plan set forth by Mr. Sheridan as to how he's going to manage these kids, what he's going to do and so forth. The court continues, Judge Bachman says, this was an excruciatingly difficult decision. The court went both ways during the period of time this matter's been under devising. This decision was quite difficult because the mother obviously loves her children and has devoted a large part of her life to these children. And I think that's really telling. You have a parent who's been incredibly involved, who has guided these kids. And I spent an important amount of time in my brief, in the statement of facts, setting forth the detail for the courts, all the things that this parent had in fact done. And without going through all these things, I do think because this is a fact case, you have to look at the facts here and see whether or not you want to take the extraordinary position of trying to tell a trial court if you really made a mistake here. And I think this is the case that you have to do that. But what the testimony was, Katie would get up with the children in the morning, give them baths. When Katie, when Penny, Penny was the oldest, when she was first born, she would get up with her at night to nurse. She would cook for them, clean up after them, change their diapers, grocery shop, schedule all their play dates, make connections with other moms so the children could play together. She testified that she was the one that purchased the birthday gifts for the children when they went to parties, according to all their activities. Kids got sick, she was the one to stay home with them. Mr. Martinkus, she could have been a perfect mother. But it seemed to me that Judge Blockman was worried about the possible alienation of the father by her. Yeah, I think you're right. But what I think you have to ask is, what evidence of alienation was there? There was none. There was nothing to show that these children were in any way whatsoever alienated. There was none. These kids, in fact, had a relationship with their father that showed no bearing of alienation. When Katie did some things early on that might not have made sense or may not have been supportive of furthering the children's relationship, you have to look at the whole picture here. What did Katie do after that? She had the children call the father every night, every night. She went and emailed the father and asked, do you want more visitation? Let's spend more time with them. She voluntarily agreed week to week during the summer. You don't have a situation where she continually moved in that path. But I think if you're looking at concerns the court has for alienation, how does the court not look at the conduct of Mr. Sheridan? I think he did. I think he mentioned certain things that the father had done that were juvenile and not appropriate. Well, I mean, if that's what you'd call juvenile, I think it's far more than juvenile. And you're right, Judge. He quotes one paragraph to that versus 10 pages to the things Katie did. What about the guardian ad litem, too, Mr. Martinez? Well, the guardian ad litem, I mean, it's clear to me the guardian ad litem found that Katie and her think it was paranoid, all sorts of things that really had no bearing on anything. The guardian ad litem found that she did some things she shouldn't have done, no question about it. But I mean, again, if you're looking at that compared to the facts giving rise to what William does, what does he do? Well, you know, he slams the door on her arm. He takes her cell phone when she's trying to call 9-1-1, smashes it, won't let her do it. He flips the breaker so she can't get out. He takes and returns the children's clothes, sticks them near the bushes in the rain, by land. Here's a man, this is pretty stunning to me in 38 years of doing this. Here's a man right before the trial. He's writing checks to his wife. And instead of putting Katie Sheridan, he's putting Katherine Schitt. It's an envelope. We look at the envelope, and inside the envelope, this is her support check. And there's a picture of my client's face with the word slut on it. This is a man who's going to facilitate a close and loving relationship with my client? It's not going to happen. I mean, you have to look at this in context. He writes an email that says, it makes me sick to refer to you as a parent. This isn't a man who's going to facilitate a relationship with my client. This is a man who has a drinking problem. He has two DUIs, one conviction. He tells Katie, you know, if you make me give up drinking, I will hate you for the rest of my life. The testimony was during the visitation. He'd come, he'd have alcohol on his breath. We have an order of supervision. The man testifies, he drank consistently. He didn't care about court orders. You think he's going to care about a court order by Judge Blockman to facilitate a relationship with Katie? It's not going to happen. But the kids are the ones that are going to suffer. If you think the violin lessons, you think that the piano lessons, you think all this involvement, all of these things that are set forth in the brief, all the incredible things that this mom has done, it's not going to continue. This guy's an alcoholic. He's going to go drink in the garage with his girlfriend, and the kids are going to watch TV. That's what you're looking at. Now, again. Was there evidence that he was an alcoholic? Absolutely. Well, that's a good point. I don't disagree. I think that one who drinks at least three to four beers, admittedly, three to four beers a night for three to four more nights per week, who's had two DUIs, who can't control himself, who says to someone, if you make me give up, I'll hate you for the rest of your life, who comes to visitation when my client had his kids, but she had sole custody for two years, comes to visitation smelling like alcohol. Yeah, I think that's an alcoholic. Now, again, maybe you don't, but I think this is a case where this gentleman has a clear problem with alcohol. Counsel, your argument is very persuasive. Why did the trial court not agree with it? Judge, I don't know, and that's a really good question. I respect Judge Blackman. I've been in front of him many, many, many times. Great judge. Great judge. I've been here twice. Once about 12, 15 years ago, not you, but this court reversed Judge Blackman on a totally unrelated matter. I don't know. I mean, that's just the truth. I think that, I think he got caught up on some of the bizarre stuff that maybe Katie talked about, her views, things of that nature, but these kids are going to suffer. I'm guaranteeing you this. They're not going to have the continued involvement of their mom, who was incredible. I mean, she did all these things, all this involvement with the school, violin lessons for Penny, piano lessons for Sophie. What caused the breakdown of the marriage? Do you know? I don't know. Was there evidence of that? Well, I think one of the biggest things that caused the breakdown of the marriage was the drinking, that Katie would ask him, beg him to stop drinking. You know, I mean, this guy was someone who could hold down a job. I'm not saying that. He works at a bar. I mean, he works at a bar. I thought he was a school teacher. Yeah, he teaches during the day, then goes and works at a bar two, three, four times a week. You know, I mean, it's pervasive. This is going to be a tragedy if Mr. Sheridan has these kids. I'm going to assert that right now. You'll see problems with these kids that will surface. This is not someone who's going to be in a position to do all these incredible things that the court itself acknowledges. And Justice Turner, you're absolutely right. It's really difficult for me to sit here and tell you why did Judge Blockman do it. And all I can tell you is that he looked at some things. He got all caught up in this order of protection stuff. When my client filed for an order of protection in June or July, this is before the divorce was even pending. And what did she do? She filed it because of the conduct, the conduct that Mr. Sheridan was engaging in. He slams the door in her arm. He takes and won't let her leave. He is abusive to her. She tries to go. He takes the breaker and doesn't let her open the door. When she figures that out, he sets the car off the house. She then picks up the phone. And I'm not just telling you these are allegations. These are his admissions. He said, well, I was upset. This is a man who admitted this conduct. She's calling 911. He takes it and smashes the phone. I mean, and Judge Blockman is critical, for what reasons, I have no clue, because she then wanted to get an order of protection. Well, it's not just Judge Blockman's decision that you're taking issue with. Ultimately, it is. But he was following the recommendation of the guardian ad litem here. So the guardian ad litem was also, in your opinion, misled by something. Both went down the wrong path and took that same path? Well, I don't know. Justice Harris, your point's well taken. The question, I think, really becomes here, becomes this. If you look at what the basis of the opinion was for the guardian ad litem, and maybe it Blockman's views in some sense. But can you really look? I mean, I think that's what an appellate court does. I think you have to say, well, I understand here's what the trial court did, and here's what the jail report was. But if you look at all these facts, and otherwise, what reasons do we have in an appellate court? I recognize that it's tough for me to come before you. I recognize it. And say, hey, you know what? Blockman really blew this one. He got all the facts wrong. And you're going to say to me, well, wait a second. He just relied upon the jail report, and this and that. But this is one of the very usual cases for me, where I can honestly say, when I look at all the underlying facts, when you really look at all the facts giving rise to this, I don't know why the jail necessarily, or why, you know, sometimes in life, in my experience, people get off on the wrong track. And if that happens, it's pretty hard to right the ship. And I think at some point that happened here. I think that clearly there was a disconnect between Judge Blockman, maybe Daniel Lennox as well, my client. Wrong and different. I don't know why. Well, I'm sure that your client understands, because you've explained it to your client, and Mr. Lerner has explained it to his client, that you're not starting out with a fresh slate here and presenting evidence anew, and that we're making a de novo decision. We owe a significant amount of deference to the trial court's findings here. Judge Blockman's there hearing the evidence, determining credibility issues. So what is it, specifically, that you can point to us that is so manifestly error in Judge Blockman's decision? Well, you raise an interesting point. This isn't a case where Judge Blockman is looking at the witnesses, determining credibility and all that, because a lot of what he decided on was uncontested. Where I think Judge Blockman really missed the boat in this, where I think you under someone who's been the primary caretaker for all these kids' lives, someone whose mother has been involved daily with these kids, someone who, in fact, has done all the things that are set forth in here. I won't go through them again, because I think I spent 20 pages listening, and Judge Blockman acknowledges these are all the incredible things this mother has accomplished. And what you're really looking at here is whether or not, under these circumstances, whether or not Judge Blockman's concern over his thinking that it's a misuse of the order of protection statute, which I set forth in great deal, I don't think it's misuse even close to that, whether or not he became skewed in terms of how he approached this. Why would you do this? I mean, why would you put in your opinion, this is going to be tough, this transition is going to be brutal for these kids. Why put them through that? I mean, I don't get it. I just don't understand. I mean, we talk about cases, too, I've cited in here that talk about, you can't look at this in a vacuum. If the kids have been in the care of mom for all these years, and specifically for a temporary period, for two and a half years or whatever it was, you can't simply let that go in the dark. I don't know how in this case you can't look at this and say, I have a parent here who might have some weird thoughts, might have done some stupid things, might have some problems, but she is incredible with these kids. These kids are stable. These kids do well in school. They play the violin. They play the piano. What about the fact that she took the children, or at least one of them, to a psychologist who found, and she was informing the psychologist there was potential sexual abuse going on. That psychologist said she found no evidence of that. So then she takes her to Osgoode. That's not true, Judge. Honestly, if you look at what they're talking about, the first one simply said, I'm not an expert. She refers her to doctors. That's how I put out my brief, because that's what Judge Block concludes. And I put out, and I cite to the transcript. That's not what happened. Judge Block somehow came with that conclusion. How he got that is beyond me. The first one simply said, I'm not the expert on this. Go see Dr. Osgoode. So she does. She says Dr. Osgoode. And then, of course, she's in this horrific position, because in Champaign County, if you're presented with some evidence like this, and if you don't do something to try to get some help, or at least invoke some judicial authority to protect these kids, and if DCFS later finds out there's a problem, well, the DCFS, I've been down this road many times, comes after you. And says, Mom, you were told this, and you didn't do anything about it. So you're in this horrific, between a rock and a hard place. Do I take some actions? And this is one of the issues I raised, too, which I was really confused on why Judge Block wouldn't let me permit me to show the report of Dr. Osgoode, just simply as the basis for why my client took these steps. It made no sense to me. He refers to Dr. Appleton's report, or he refers to Dr. Osgoode's report, and then says it's too prejudicial for me to allow testimony concerning what she relied upon. So that's all part of it. But here's a woman who's presented with this fact. Her daughter's coming home to talk about having his penis. I think most of us would say, what? What are you talking about? What's going on here? How do we know that? Well, my client testified to that. My mother testified to that. Judy Osgoode confirmed it. We have various things that certainly were a concern. Now, she does the right thing. She tries to get some assistance. Once this passes, once we determine that there isn't a problem, she moves forward. But hindsight's wonderful on these things. Whenever you go back and say, why did someone do this? Why did someone do that? Put yourself in their shoes, it's not so clear. You do your best. You try your hardest. And Judge Block was critical, I suspect, because the second OP was near the time of the visitation hearing. Well, Judge Block, I think, acknowledges. She didn't attempt to do anything at the visitation. That was to be reserved. We knew we had a hearing on that. Because we had Judge Judy Osgoode's report, and because they voluntarily agreed to supervise visitation, how is that on my case? If his client didn't want to do that, have a hearing. Ask for a continuance. He agreed to it. He voluntarily agreed to it. And it just seems every inference here, if my client does something, Judge Block took the wrong inference. And I don't know how you look at this and you don't look at the underlying facts. I mean, it's pretty horrific for me, where the mom has all these incredible things that she does for these kids. We have a dad who really has very little in the evidence and transcripts. No plan. We don't know today what his plan is. Now, I can assure you certain things are happening, because I know. But that's not before you. But all I can tell you is that you have a situation where the judge had left a guess as to what is William's plan. And we have all of these particular, detailed expectations based upon the continuum of conduct of my client and her mother. So now you just guess and you hope, well, you know, the judge acknowledges himself that this is going to be really, really tough on these kids. But that's OK somehow. It's not OK. It's truly not OK. This is not a decision that you should sustain. And I know how hard it is for you to do it. I know how hard it is for me to come and ask you to do it. I recognize that. This is that case. There's no discernible reason to put these kids in the care of an alcoholic who, you know, to this day, you look at all these things. I mean, his attitudes toward my client. Gives the finger to the parents. Every time he sees them, this is his response. You think kids don't pick up on that? I mean, come on. You put your kid's clothes in the rain. Kids don't pick up on that? I mean, come on. Here's a man who says, it makes me sick to think of you as a parent. How's he going to convey that message when he talks to his kids about mom or something like that? I mean, to me, this would be a little different, I guess. If I had someone on the other side who was clean, was good, did everything right, and my client screwed up the way she did, I agree. You could say, well, you know, too bad. She screwed up. But it's certainly not a case where here you have someone who's not a good custodial choice, who's not going to be someone that's going to take these kids and run with them and do the things necessary to help them grow, mature, and be everything they can be. When you have someone who not only could do it, has done it. To me, it's not a close case. And I respect Judge Block, and believe me, I do. I recognize that he's a really, really good client of mine. But I just think this is one where, when are you going to step up? What level does an appellate court ever reach to say, well, these facts just don't support the decision? I realize it's very hard. But I'm counting it as a case. Thank you. Thank you, Mr. Martinkus. You'll have a chance on rebuttal, too. Thank you. Mr. Lerner? Thank you. May I please the court, counsel? I think what I'd like to do is start off by answering some of Mr. Martinkus's questions. I know I'm here to answer your questions. But I did want to address some of that. Because he asked, why did the trial court make this decision? We've got an extremely extensive ruling by the courts, 26 pages. We know why the judge made these decisions. And the judge did say, yeah, there's going to be some difficulties with this. This was not an easy decision to make, and he didn't take it lightly. And he did look at the problems my client had, as well as the problems Mr. Martinkus's client had. The other question, and by the way, this whole thing about my client being an alcoholic, there was one DUI conviction. There's no reason to believe he's an alcoholic. There's testimony as far as both parents drinking and things of that nature. But that's not the deciding factor here. He may bring that up as, you know, my client is a falling down drunk, whatever. But it's simply not true, and it's simply not supported by the evidence. My client's a great school teacher. Now, Mr. Martinkus asked about what evidence of alienation. The record is full of evidence of alienation, and the court is very concerned about it. We have the first OP, and by the way, this whole thing about his client being the primary custodian, she was not the primary custodian. We have four kids here. My client played an active role in caring for the children because he has to. You can't have that many children without both parents being involved. But when she kicks him out and does whatever she can not to allow him around the children, then she can say, I spent more time with the children. But that's not right, and that's what we have here. The first order of protection, they separate. Immediately, she files an order of protection claiming or seeking to restrict visitation. Then we get a hearing set for, I think, December 20th to try and get a hearing, some sort of temporary visitation. Right before we get a hearing date, she files a second order of protection. Mind you, both orders of protection, the emergency orders were denied, and then she dismissed them both when it came to a plenary one. But then the day before our hearing to set visitation, she, for the first time, alleges sexual abuse. Anytime we get close to being able to have my client see his children, she does whatever she can to avoid that. Whatever she can to use the Domestic Violence Act to gain advantage in the Marriage and Dissolution Act or any other way, it's consistent with her email saying, hey, he's not going to be seeing these children. It's consistent with everything she does. In fact, she talks, she's got these, I think the judge described them as medieval sexual attitudes towards the children. What do you mean by that? Well, she won't, she testified that she won't let the children or thinks it's inappropriate for the children to go use the restroom with him there if they're in a football game or a public event. She says that a father, if a child has a bad dream and it's a girl child, she shouldn't be able to come to her father in the middle of the night and ask if he could spend the night there. A father shouldn't be able to take the child swimming. And if you think about these attitudes, they seem like, she's just backwards or she's just stirring. Counselor, Mr. Martinkus argued that the trial court said the transition for these children will be brutal. Is that an exaggeration or is that what the trial court said? I don't think he used the word brutal, but maybe I'm wrong. I'll go back and look. But imagine if he's concerned a little bit about the transition, how nightmarish the situation would be if not for the trial court. I guess if the transition would be brutal or traumatic for the kids, why wouldn't the trial court keep the stability of the children with mom and then closely monitor visitation to make sure that dad gets plenty of time with the kids and dad has input in the kids' lives? My guess is because we're not dealing with a normal situation. We're dealing with a situation that's potentially nightmarish for these children and she would never allow these children to have real time with the father. It would just be another opportunity for her to make up some sort of other allegation. The mother testified in court that she believed her husband, the school teacher, sexually- What did she do that created a nightmarish situation for the children? Everything she can to keep the father away from them. But this is the one that really bothers me is he's a school teacher, right? So the allegation of sexual abuse destroys the family, right? If that gets out, he loses the job, the family's gone. He provides all the money to the family, basically. She testifies- I mean, this is the nuclear bomb of accusations. I mean, this is the worst. She testified she believed he sexually abused her. She went and she goes to a doctor. And I do want to bring this up because Mr. Martinkus did before I forget. He keeps saying the judge should have read the report. No, he shouldn't. It's hearsay. But he could have brought her in to testify. That's what the court would do. If he's got a problem getting in that report, he had the opportunity to present that evidence. Should the judge read a report based on hearsay? Of course not. But the report, nobody claims, including Mr. Martinkus, that these children were sexually abused. But the mother said she believed it happened anyway. How is she going to facilitate a relationship with these children? If she believes she's sending her children away every weekend or whatever to a sex abuser, either she doesn't believe that and it shows a great deal of dishonesty and just plain evil. I mean, if she would not believe that and accuse somebody falsely of it. Or she does believe that and there's simply no ability to facilitate that relationship. If I believed my children were being sexually abused, I wouldn't send them to the sexual abuser court order or not. I'd be sitting in jail. I think that you're going to get one of those two things. But these views, I want to go back to the views that I consider sort of crazy views, are a part of this. Because if you can't go to the bathroom with your children in a public place, well, you can't have a lot of fun. You can't go to games. You can't go to Disney World. And that's what she's trying to do here. She doesn't want dads to be a place of fun. She wants moms to be the only place that matters. The safe haven, I think she calls it, or something of that nature. We've got such evidence, including her emails, about how she wants to keep the father away from this child. This has gone on for years, well, since 2011. Mr. Lerner, how did they get to this level of vitriol? They have four children. What caused it all, do you know? I don't. Is there evidence of that at the trial? There really, I mean, you know, I guess as a lawyer, I'm probably the wrong person to talk about the true meaning of love and when it happens and when it doesn't happen. But I don't know how you go from presumably people being in love to people hating one another. I mean, because his actions were terrible, too. You know, this writing of her name on the checks, the way he did it, and her picture with the word slut across it. I mean, how do you get to that point? And the reason we know his actions were terrible is because the judge took that into consideration. I mean, the judge took all of this stuff into consideration. And I don't know, I don't think I can answer your question as far as what happened between them. If he's calling her a slut and calling her last word, her last name, shit, how's he going to foster a relationship with her? Well, I mean, she's saying his head looks like a penis in front of the children. She's using dirty language in front of him in front of the children. I mean, yes, this isn't the ideal situation. I would really enjoy these people to realize they have children together and be more mature. And I think that's certainly an indication that my client is trying to do that. But there's a difference between calling somebody a slut and a whore and saying, you sexually abused these children when you didn't. I didn't try to put any of these comments in any type of chronology. Were his comments, did they occur more towards the beginning of the action and then hers were throughout? Or is there any rhyme or reason there? Did Judge Blockman attempt to put it in any kind of temporal relationship? I think he does, and I think there is. As far as his comments, most of those comments were just at the time of separation. So Judge Blockman did point out that this was sort of angry. There was an issue that Mr. Martinko points out as to whether these checks said shit or didn't say shit. My client indicates that's not what they said. That was later in time. He said that that was writing Sheridan. Well, maybe you ought to get away from that one because that doesn't seem to be too credible misspelling or writing so illegibly that Sheridan is made to look like a four letter profane word. Be that as it may, at page 18 of Judge Blockman's order, he writes that there was testimony in the record from a respondent. He says, respondent testified the petitioner hid the children's medical information from him, refused to provide him a copy of one of the children's IEPs, refused to allow him to take the children to a doctor, refused to tell him the name of the girls counselor, and refused to allow him to pick up the girls from school, claiming that if he did, it would be a scene at the school. Now, these are actions as opposed to words spoken. And so I'm curious, was there testimony? Did the petitioner counter that? Did she refute that in her testimony that these actions occurred? The, and just for timing's sake, if I could go back one moment. She did everything she could to stop all contact with the father, letters, emails throughout the entire case, up until the GAL report. Once the GAL reported that he should have custody because of these actions on her part, then it calmed down a little bit after that. But not until the GAL recommended he have custody did that slow down. But as far as those comments, I believe those came out. My client's testimony, the GAL's testimony as to some of that stuff, I don't remember her refuting those comments, but I could be wrong. But many of them were supported by emails anyway. And I don't believe she refuted any of the email comments. But I mean, I think, and I'm not saying this, well, maybe I am, but the judge wrote an extremely detailed 26-page report here. He considered every argument Mr. Martinkus has brought up. He considered every argument I've brought up. He has put that down here in a concise manner. He's put it in terms of timing. He's done all of that for us. And to claim this is an abuse of discretion, even if he doesn't believe what the judge said, to me, is outrageous. There is not a single issue they brought up that we could consider de novo. It is all an abuse of discretion. And if you look at the issues, the four issues they brought up, as far as the court erred in failing to make a finding that William was unwilling to facilitate the relationship, the court talks about things that are juvenile and immature. He did consider that in great detail. As far as the mother's argument too, again, it may have been longer, but only because the mother did more things. We have the two doctors, the two OPs, the timing of doing all of this right before the visitation, her emails, the GAL's reports. There's just more to talk about. But he certainly addressed those issues in great detail. Now, as far as the trial court erring in refusing to consider Dr. Osgood's report, again, he shouldn't have considered it at all because she didn't testify. He only considered it in terms of acceptable hearsays going through the GAL's report. But this was never called as a witness. It shouldn't have been considered. And he basically already talked about what Mr. Martinkus wanted him to talk about. He clearly did consider it, even though I don't think he should have, in his report. So the guardian ad litem's testimony regarding sexual abuse for Kate's mental health, I don't think the guardian ad litem really did deal with those issues beyond on sort of a surface level, or the trial court's error in failing to assess the situation from the perspective of the children. Again, the children weren't called as witnesses either. The GAL, though, talked to the children, and the GAL made those decisions. But of these arguments, all of them are an abuse of discretion standard. All of them were clearly considered in great detail by the court. So I'm really at a loss to understand how Judge Blackman abused his discretion in coming up with this well-thought-out argument. At the time Judge Blackman issued his order, he hadn't set visitation. Has visitation been set for the mother now? It has. What's the arrangement? It is, I'm sorry, I don't remember exactly. It is slightly more than a protocol. So she is getting more time with the child than our protocol in Champaign County. It's not a 50-50 split, but she is getting more time. I'll check with Mr. Martinkus when he gets up again. Well, what's your protocol in Champaign County? Generally, we're talking— Every other weekend? Yeah, we're talking every other weekend, maybe a few hours on a Wednesday during the week. The court specifically said in this case that he's going to give her more protocol, and in fact did give her more than protocol. The mother certainly has had a close relationship with these children, and we're not trying to deny either parent a chance to bond with these children, but if the mother were to have custody, then my client would never have a relationship with these children. This way, the mother is getting more than protocol visitation, and the father is having an opportunity to see his children. And as far as I know, I guess we can't argue it into the future, but Mr. Martinkus did, so I will. He said this is going to be a disaster into the future. I certainly don't see. This order was entered quite some time ago, and I don't see a disaster, so I don't quite understand that prediction of the future. But in closing, I would just say that if you read this report and you see that this woman was willing to sacrifice her children and everything else to falsely accuse somebody of sexual abuse, then I don't understand how it would make any sense with that issue alone for her to have custody. Thank you, Mr. Warner. Thank you. Mr. Martinkus, do you have any rebuttal? Well, you know, you asked why Judge Blackman did some things. Maybe he bought into some of the things like he just said to you. My client didn't accuse anyone of sexual abuse. My client said she received a report from Judy Osgood that had concerns over boundaries, over why Sophie's masturbating, why she's drawing pictures of her dad's penis. I don't think that's the same thing as going to his employer, the state's attorney, and claiming sexual abuse. It's really tough when you're a mom and a parent to sit there and see these things happening to your kids and then be afraid to do anything. And maybe that's the message. If you do something, ultimately in a divorce case, it's going to come back and bite you. So I don't get that at all, but maybe that's part of the confusion here. There's a couple things I'm just at a loss. How Mr. Warner argues that Judge Blackman simply erred in not permitting my consideration of Judy Osgood's report for the limited purpose of showing why she acted. Our Rule 801 on hearsay says, Hearsay is a statement other than one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted. Never offered in evidence for the truth of the matter asserted. We abandoned that fact. Judge Blackman chastised Mr. Warner. He told him, they're not even offering this. Why are you bringing this up? But for us not to be able to show why she did these things was wrong. Whether you find it to be meaningfully wrong or anything, I don't know. One of the things Justice Harris, you raised, and this is just wrong by Mr. Lerner. The timing is exactly right. If you hit on this, you're exactly correct. My client's actions and what she did was at the time in July when they're separating with being abusive to her when he's doing many things. She did some things she shouldn't have done. But as she went further, that stopped. That communication stopped. She engaged in conduct in which she did, in fact, invite him to do things. Where he got week to week during the summer. Where she asked him for more visitation. What Mr. Lerner's client does, those checks, if I remember, were weeks. This might have been the most recent check where he writes to her, Katherine Schitt. This is weeks before the hearing. Now, that doesn't tell you something. Somebody who is so oblivious to the fact that a judge might look at this and think, wow, you must really have a problem here, sir. You're still writing checks and putting that expetive on your check a couple of days or weeks before the hearing. That, to me, is extremely troubling. There's a red herring here, too, that, oh, my client doesn't want him to go in washrooms with the girls. No, that's no offense. But who really cares at this point? When he has these kids, he's going to do with them as he sees fit. She has no ability to stop these things. It's not going to be the end of the merriment because he can't go to Disney World. That's nonsense. He's going to do whatever he wants to do and all those things. Judge Blockman's opinion, two things that you do know. There's no issue about primary custody. To the extent that Mr. Lerner suggests otherwise, he's simply an error. The court clearly, unequivocally said in his findings that the primary custodial parent, the mother has been the primary custodial parent. So there's no issue here of whether or not the court found his client to be equally apparent or not. No, she was the primary custodial parent. And I may have used a word that wasn't exactly the words that Judge Blockman used with respect to transition. His exact words were, quote, quite difficult. So if I said it with more vigor than I should have, I apologize. But certainly, the issue here of whether or not it's going to be quite difficult for these kids, that's really what, in fact, you're looking at in terms of how this affects these kids. What kind of visitation did your client get? Judge, she got a little more than she would get normally. He's right. Typically, in our county, unlike some, you have every other week, you might see the kids a day during the week for dinner or something like that. I got to be honest with you, I don't remember exactly. He gave her one extra day or something like that. So she got a little more time than someone who would otherwise be before the court. But she is certainly about maybe now 30% of the time with these kids compared to William, who has the kids about 70% of the time. So this isn't a case where these kids are now getting to spend time with the mother in an amount that makes some sense. It's a tragic case from my perspective. I recognize that we're talking about issues that are difficult for the public court to look at. But I think if you really look at the way this transition has occurred. One other thing, too, I do want to mention, because I think it's important. William, when asked the question about the time and the visitation and what's going on now, I asked him this question. I said, but you don't disagree, sir, that since the separation in July of 2011, that actually things have gotten on a pretty even keel. Would you agree? William shared an answer, I would agree. So this concept here of my client continuing to do things that would not be in the best interest are rebutted not just by me, not by some other person, but by William himself. He acknowledges that, in fact, they were doing better, that there was this even keel. But his conduct never changed. His conduct right to the very end, taking their kids stuff, putting it into the bushes when it's raining, continually giving the finger to parents, writing these stupid checks and putting pictures of my client's face on an envelope. But this stuff isn't just, in my opinion... Can you give us your red light? Oh, sorry. Thank you. Thank you. All right. We will take this matter under advisement and stand in recess until the next case.